SEDGWICK S. BRINSMAID, Appellee, v. THE ORDER OF UNITED COMMERCIAL TRAVELERS OF AMERICA, Appellant.

**Accident insurance:** EVIDENCE.  In this action for the accidental death of insured the evidence is held to be in conflict as to whether deceased came to his death from drowning, or from the rupture of an artery while bathing, and to require submission of the case to the jury.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN, Judge.

TUESDAY, NOVEMBER 19, 1912.

THIS is an action at law upon a certificate of membership in the defendant association.  The defendant is a mutual association and purports to issue accident insurance to its members.  Thomas F. Brinsmaid was one of its members in good standing.  It is averred that he lost his life on November 27, 1907, by drowning at Long Beach, Cal.  The circumstances of his death are made to appear by the evidence in the record.  The defendant denies that the insured met his death by drowning, and avers that such death

was caused by rupture of the large artery near the heart, known as the aorta. The question was submitted by the trial court to the jury, which found for the plaintiff. Judgment was entered upon the verdict, and the defendant appeals.—*Affirmed.*

*Sullivan & Sullivan,* and *Vorys, Sater, Seymour & Pease,* for appellant.

*Clinton L. Nourse,* for appellee.

EVANS, J.—There is no controversy in this case over the fact of death. The sole dispute is as to the cause of it. It is undisputed that on November 27, 1907, the insured went bathing at Long Beach, Cal.; that he was apparently well and strong when he entered the water; that he in some manner became helpless to save himself, and that he was later taken from the water either actually dead or so nearly so that all efforts at resuscitation failed. The insured was forty-four years of age, six feet one inch tall, weighed from one hundred and ninety to two hundred pounds, in apparently fine physical condition, all "muscle and bone," without surplus tissue. Eyewitnesses testified to the circumstances of the alleged drowning. The testimony on behalf of the plaintiff tends to show that the tide was running unusually high and the breakers and the undertow were unusually strong. One of the witnesses who first saw the peril of the insured and went to his assistance was Mrs. Pitcher, who testified as follows: "The breakers were running high that afternoon. At the farthest point Mr. Brinsmaid went out, I should say it was about six or seven feet deep. I noticed him when he first went out. The breakers went over him. When I reached him, the water was six or seven feet deep. The breakers would have gone over me if I had not jumped. I had to jump to get over them. I was a strong and good swimmer at that time, ac-

customed to the surf. I was three or four days getting over it. The tide was very high that afternoon." Cross-examination: "I saw Mr. Brinsmaid when he first went into the water, and my eye followed him out. He went out through the breakers. I watched him for five minutes or more until I first noticed him acting queerly. At the time, he was being knocked down by the breakers; he was not under water, of course, for more than a second at a time. I should say that, if a person gets knocked down once by the breakers, it would be quite hard to get their feet again, and a breaker coming in would knock him down again. It is very liable to happen to any good swimmer. After being struck by the first breaker, Mr. Brinsmaid was knocked down into the water. He then came up to the surface and was knocked down again. Then I did not watch him for a few seconds, and then I saw him floating on his back. When I got to him I seemed to feel a shock go through his body, and thought I heard him groan." Also: "Mr. Brinsmaid went out four hundred or five hundred feet through the breakers. The breakers were high that afternoon. He went out a couple hundred feet farther than I did, and I think it would be about six or seven feet deep there. I noticed him, and it seemed like he was trying to help himself along and motioning with his hands. I stood there and watched him. Until he turned over I was not certain he needed help." Other testimony along the same line we need not repeat. Doctors were called and efforts at resuscitation continued for the space of two hours. When the body was taken from the water the heart was beating, and so continued for some time. During the efforts at resuscitation, other signs of life appeared, but the final result was failure. On the face of it, this evidence would seem ample warrant to support the finding of the jury that the insured came to his death by drowning. If drowned, there is no controversy made but that such drowning was accidental and within the terms of the insurance certificate.

On behalf of defendant it was made to appear that an autopsy was held by Dr. Campbell, assistant to the coroner. Dr. Campbell testified that he found an aneurism in a branch of the aorta, and a rupture of the artery at such point. An aneurism is said to be a tumor and is the result of disease in the coats of the artery. This rupture was alleged to be about one-half inch by three-eighths. It is undisputed that if such rupture had occurred during the life of the insured it would cause instantaneous death. No one assisted Dr. Campbell in the autopsy, nor was any one present except the undertaker. That a jury would have been justified in finding such rupture to have been the cause of death, there can be no doubt. But the contention of the defendant is that there was no fair conflict in the evidence as to the cause of death, and that the trial court should have directed a verdict for the defendant. And this is the only question before us. It is enough to say that there are many facts testified to by witnesses for the plaintiff which are wholly inconsistent with the theory of instantaneous death as a result of the alleged rupture. The truth of the testimony to establish such facts was, of course, for the jury. The doctors who worked over the body in efforts at resuscitation testified on behalf of the plaintiff. Their opinion was that drowning was the cause of death, and the facts upon which such opinions were based were fully stated in their testimony. The expert testimony to the contrary, except that of Dr. Campbell, was wholly hypothetical.

We can not assume to weigh the evidence in this review, or to determine where its preponderance lies. What is clear to us is that there was a fair conflict of evidence on the pivotal question, and the trial court could not properly have directed a verdict. All the assignments of error and argument are directed to this one proposition.

The judgment of the trial court must therefore be —*Affirmed*.